# EXHIBIT E

Postfach, CH-8034 Zürich

BEILAGE 1

# WILLKIE FARR & GALLAGHER

**MEMORANDUM**

FROM:    Willkie Farr & Gallagher LLP

RE:      Excluding the US

DATED:   March 28, 2007

---

In connection with the proposed offer by SCOR S.A. ("SCOR" or the "Offeror") to acquire Converium via a public tender offer (the "Offer"), we have reviewed the memorandum entitled "Excluding the US Further Analysis (II)" (the "Skadden Memo II") authored by Skadden, Arps, Slate, Meagher & and Flom LLP, counsel to SCOR ("Skadden"), as well as Skadden's other memoranda filed with the Swiss Takeover Board (the "TOB") regarding the same subject.

Skadden continues to suggest that "... a decision by the TOB to permit SCOR to exclude the US from the Offer would not likely preclude US holders from tendering their shares in the Offer." As discussed in our earlier memoranda and in more detail below, it is our view (based on clear SEC guidance, copies of which were appended to our memorandum of March 5, 2007) that excluding US persons from the Offer, while at the same time suggesting that they may find other means to participate in the Offer would result in violations of the US securities laws. We urge you to discuss our views with the Office of Mergers and Acquisitions of the SEC should you have any questions on this issue. Skadden's suggestion that "Converium's US Shareholders will not be materially affected by a decision not to extend the Offer into the US" is legally and analytically flawed. Sections I, II and III below set forth our rationale for this conclusion and Section IV below our views on SCOR's planned SEC deregistration.

I.   **Excluding the US would prevent 23% of Converium's shareholders (including 2891 beneficial owners of ADRs) from participating in the Offer.**

The position taken by Skadden, on behalf of SCOR, with respect to the exclusion of US persons from the Offer is inconsistent. Skadden argues, on the one hand, that the TOB should permit it to exclude US persons from the Offer and, on the other hand, that US holders may nevertheless participate in the Offer. As the SEC has stated in the release adopting the SEC rules regarding Cross-Border Tender and Exchange Offers, Business Combinations and Rights Offerings (SEC Release No. 33-7759) (the "Cross-Border Release"), "Offerors cannot accomplish indirectly what they purport not to be doing directly."

Putting aside the question of whether exclusion is permissible under US law in the context of an unsolicited takeover bid involving two US-listed companies, it must be the case that SCOR is required to take affirmative and effective steps to exclude US persons if it purports to do so. That they have stated the Offer will not be made to US persons is not sufficient. Thus, it should be clear to all concerned that if SCOR purports to exclude US persons from the Offer, approximately 23% of Converium's shareholders will not be able to participate in the Offer. Skadden asserts that

sophisticated investors can find ways to participate through foreign intermediaries. In its March 9, 2007 memorandum, Skadden suggests this participation is possible because "determining the beneficial ownership of a shareholder who has transferred its shares to a nominee in Switzerland intending to participate in a Swiss offer is extremely difficult before the fact." This is not credible. In the context of a tender offer, it is very simple to establish procedures to prevent US persons from tendering in the Offer. Among other things, we would expect that the offering materials would require investors or anyone tendering on the investors' behalf, to certify that the investor is not a person in the US or a US person. Furthermore, any nominees that receive the offering documents must be instructed not to forward the document to US persons. Each accepting holder must represent, among other things, that such holder is not an agent, nominee or fiduciary acting on behalf of a US person.

In this regard, the SEC itself has stated in the Cross-Border Release that in the context of tender offers "...because of their existing investment in those securities, US investors are more likely to have an incentive to find indirect means to participate in the offer, even though the materials state that the offer is not being made in the United States." The Cross Border Release goes on to say that "[a]s a result, offerors using a web site to publicize their offer should take special care that it is not used as a means to induce indirect participation by US holders of those securities." We note that SCOR has made extensive use of its website in publicizing the Offer, albeit with restrictive legends. The SEC goes on to say in the Cross Border Release an "...example of such special care would be if the offeror obtains representations by the investor or anyone tendering on the investor's behalf, that the investor is not a person in the Untied States or a US person."

Thus, it should be clear to all concerned that if SCOR is permitted to exclude the US, US persons really will be prohibited from participating.

II.    **SCOR's tactics regarding the US harm those least able to fend for themselves.**

In arguing that Converium's US shareholders will not be materially affected if the TOB permits SCOR to exclude the US, the Skadden Memo II focuses on the concentration of US ownership by institutions arguing that "...sophisticated US investors often find ways to participate in foreign tender offers..." While it is true that, as is the case with many non-US issuers, institutions represent a significant portion of the US holders in percentage terms, the suggestion by Skadden and SCOR that some US shareholders are sophisticated enough (with SCOR's tacit acceptance) to circumvent US laws and others are not is not an acceptable rationale for permitting SCOR to exclude US persons from the Offer. This is particularly the case in this context where there are a significant number of US shareholders.

Based on information provided on March 28, 2007 by The Bank of New York, the depositary for the Converium ADR facility, ADRs represent approximately 2.67% of the total outstanding Converium shares but, as of March 6, 2007, the date of the most recent broker search, *there were 2891 beneficial owners of Converium ADRs*. These are precisely the kind of investors that are most deserving of protection under equal treatment principles. If SCOR is permitted to exclude the US, these investors will not receive any offering materials or other disclosure regarding the Offer as SCOR has itself has stated in its offering materials that such materials will not be available in the US. Thus, even if Skadden's arguments regarding institutional holders are accepted, it is clear that retail holders will not be able to participate in the Offer and will be left with the choice of selling in the market at a discount to the value of the Offer or subjecting themselves to a squeeze out at an unknown point in the future. In our view this is a fundamentally unacceptable result and one that

2

Saturn_ WFG response to third Skadden memo (4).DOC

the SEC has noted with disapproval in the past. In its concept release dated June 6, 1990 (Release No. 33-6866) regarding a conceptual approach intended to encourage foreign bidders to extend multinational offers to US security holders, the SEC stated that such security holders "may be relegated to choosing, without the disclosure and procedural safeguards available under either the US or foreign regulatory scheme, whether to sell into the secondary market at less than the full offering price and incur transactional costs that would not be imposed upon a tender, or to remain minority securityholders subject to the possibility of being cashed out in a subsequent 'freeze-out' merger."

III.   **SCOR's legal advisors recognize the concerns raised by excluding US investors.**

In an article entitled "European M&A Perspective: The Arcelor Defense" authored by three Skadden attorneys, attached hereto as Annex I, the authors acknowledge in the context of a hostile tender offer that " ... given the substantial percentage of [the target's] share capital held in the US and the publicity that the offer would have... it would have been very difficult to for [the acquirer] to completely exclude the US" The authors further acknowledge that "If [the acquirer] had attempted to exclude the US, it would have run the risk of being challenged in court by [the target's] US shareholders and perhaps also US securities regulators." Given the parallels between this transaction and the Arcelor situation (e.g., hostile offer, large US shareholder base of the target and significant international publicity) and Skadden's repeated statements of concern regarding the threat of US litigation, Skadden's statements regarding exclusion of US persons to the TOB are hollow.

IV.   **SCOR's plans regarding deregistration must be weighed against the inequity of excluding Converium's US shareholders from the Offer.**

As indicated in our prior memoranda, we do not disagree with the characterization of the SEC's deregistration rules. However, the impact of one year of additional SEC reporting costs pale in comparison to excluding 23% of the Converium Shareholders from the Offer. Moreover, we are concerned that the Skadden Memo II overstates the excess cost of extending the Offer to U.S. persons when it suggests that the estimated cost savings for SCOR will be $11.2 million. To be clear, Skadden acknowledges that extending the Offer into the US will not prevent SCOR from deregistering, it will only result in a twelve month delay.

We understand from Skadden's March 9 memorandum that the $11.2 million figure is comprised of €4.5 million of "implementation costs" and approximately €3.0 million of ongoing compliance costs. The Skadden memorandum is not at all clear as to how much of that €4.5 million has already been spent on implementation or how much of it would otherwise be spent to resolve identified material weaknesses in SCOR's internal controls whether or not SCOR is able to deregister. It is, however, very clear from SCOR's public disclosure that SCOR has been preparing for compliance with Section 404 for some time and thus it is entirely possible that a significant amount of the €4.5 million has already been spent. For example, in the SCOR 2005 Annual Report on Form 20-F, one of the risk factors provides that SCOR has identified material weaknesses in its internal controls, and in connection with Ernst & Young LLP's ("E&Y") 2004 fiscal year audit of SCOR, E&Y notified SCOR that it had two material weaknesses in its controls over financial reporting. SCOR states that "the ability of SCOR to improve its internal control over financial reporting and resolve material weaknesses in its internal control over financial reporting" could "influence SCOR's actual results and cause them to differ materially from the implied or expected results." On page 17 of the SCOR 2005 20-F, SCOR states that it intends to address these material weaknesses.

3

Saturn_ WFG response to third Skadden memo (4).DOC

Ultimately, we are not in a position to question the actual amount of SCOR's ongoing cost of Section 404 compliance. However, given that (i) SCOR has publicly stated that it intends to address the identified material weaknesses in its internal controls, (ii) the final form of the SEC's deregistration rules were only published in the last week, (iii) it is clear from SCOR's annual report disclosures that SCOR has been preparing for Section 404 compliance for some time and (iv) the compliance date for Section 404 is no later than June 30, 2007, we have serious questions about whether it is appropriate to include the full amount of the €4.5 million of "implementation costs" in the cost savings figure. Even if the Skadden cost savings figures are correct, the idea that the owners of 23% of the Converium shares (approximately, CHF 700 million of value) would be prohibited from participating in the transaction because SCOR would be required to file one more annual report with the SEC does not seem consistent with equal treatment.

We also note that Skadden has not objected to our assertion that it overstated by at least $20 million the excess cost of extending the Offer to US persons when it erroneously suggested in its March 9 memorandum that the cost savings associated with a delay in deregistration would be $31.2 million.

\* \* \*

For these reasons, we strongly believe the benefits of full disclosure and fairness to the significant number of Converium shareholders based in the US outweigh any burdens associated with extending the Offer to US persons.

Willkie Farr & Gallagher LLP

4